**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**UNITED STATES OF AMERICA,**

**vs.**                                                            **Case No.  4:08cr38-RH/CAS**
                                                                       **Case No.  4:09cv482-RH/CAS**

**BENSON LEON DEVANE, JR.,**

   **Defendant.**

_____/

## REPORT AND RECOMMENDATION TO DENY § 2255 MOTION

Defendant, though counsel, filed a motion to vacate and set aside sentence filed pursuant to 28 U.S.C. § 2255 with supporting memorandum.  Docs. 93 and 94.  The Government filed a memorandum in opposition.  Doc. 100.

Defendant filed an unopposed motion for competency evaluation, which was granted.  Doc. 109.  The evaluation was filed under seal.  Doc. 116.  I noted that the report would be considered in determining the merits of the § 2255 motion and whether a hearing would be necessary.  Doc. 117.  The parties were invited to, but not required, to file additional argument in light of the evaluation.  _Id._  The Government filed a response, and Defendant filed a memorandum.  Docs. 119 and 120.

**Legal standards governing this motion**

Errors raised and disposed of on direct appeal are not considered on a § 2255 motion absent an intervening change of law.  Davis v. United States, 417 U.S. 333, 342, 94 S.Ct. 2298, 2303, 41 L.Ed.2d 109 (1974); United States v. Nyhuis, 211 F.3d 1340 , 1343 (11th Cir. 2000) (citation omitted).  "A rejected claim does not merit rehearing on a different, but previously available, legal theory."  Nyhuis, 211 F.3d at 1343, citation omitted.  Conversely, if the issue was not raised on appeal it is procedurally barred and will not be reviewed absent a showing of cause and prejudice.  Id., at 1344 (citations and footnote omitted).  "Ineffective assistance of counsel may satisfy the cause exception to a procedural bar," but "the claim of ineffective assistance must have merit."  Nyhuis, 211 F.3d at 1344, citation omitted.  And ineffective assistance of counsel may be raised in a § 2255 motion, whether or not it could have been raised on direct appeal.  Massaro v. United States, 538 U.S. 500, 504, 123 S.Ct. 1690, 1693-94, 155 L.Ed. 2d 714 (2003).

The standard for evaluating an ineffectiveness of counsel claim was set forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  Under Strickland, "[a] convicted defendant making a claim of ineffective assistance of counsel must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  466 U.S. at 690, 104 S.Ct. at 2066.  In determining whether counsel gave adequate assistance, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  Id.

> To establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness."  A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance.  The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."

Harrington v. Richter, 131 S.Ct. 770, 788, 178 L.Ed.2d 624 (2011) (quoting Strickland);

Premo v. Moore,  131 S.Ct. 733, 739, 178 L.Ed.2d 649 (2011) (quoting Harrington).[1]

Even if deficient performance is demonstrated, a petitioner must also show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  466 U.S. at 694, 104 S.Ct. at 2068. It is not enough to show counsel's errors had a conceivable effect on the outcome, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  466 U.S. at 687, 131 S.Ct. at 2064; Harrington, 131 S.Ct. at 787-88 (quoting this language).  "[T]he question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently," but whether a different result is "reasonably likely."  131 S.Ct. at 791-792 (citing Strickland, other citation omitted). This is not a "more likely than not" standard, but "[t]he likelihood of a different result must be substantial, not just conceivable."  Id., at 793, 104 S.Ct. 2052. (citations omitted).

---

[1] Harrington and Premo were decided by the Court on the same day.

While <u>Strickland</u> explained the performance then the prejudice standards in that order, the court need not address them in that order or even address both, as failure to demonstrate either step of <u>Strickland</u> is dispositive of the claim against the petitioner. 466 U.S. at 697, 104 S.Ct. at 2069.  "Surmounting <u>Strickland</u>'s high bar is never an easy task," as an ineffectiveness claim functions as a way to present claims not properly presented earlier.  <u>Harrington</u>, 131 S.Ct. at 788 (citation omitted).

The <u>Strickland</u> formula applies to claims of ineffectiveness of counsel in the context of a guilty plea.  <u>Hill v. Lockhart</u>, 467 U.S. 52, 58, 106 S.Ct 366, 370, 88 L.Ed.2d 203 (1985); <u>Stano v. Dugger</u>, 921 F.2d 1125, 1149 (11th Cir.), <i>cert. denied</i>, 502 U.S. 835 (1991) (citing <u>Hill</u>, other citations omitted).  While the performance analysis is the same, the prejudice inquiry focuses on the effect of counsel's performance on the guilty plea process, and "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."  921 F.2d at 1150, quoting <u>Hill</u>, 467 U.S. at 59, 106 S.Ct. at 370.

Finally, in a challenge to a guilty plea under § 2255:

[T]he representations of the defendant, his lawyer, and the prosecutor at [the plea] hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings.  Solemn declarations in open court carry a strong presumption of verity.  The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible.

<u>Blackledge v. Allison</u>, 431 U.S. 63, 73-74, 97 S.Ct. 1621, 1629, 52 L.Ed.2d 136 (1977) (citations omitted); <i>see also</i> <u>United States v. Medlock</u>, 12 F.3d 185, 187 (11th Cir. 1994) (there is a strong presumption that statements made during a plea colloquy are true).

**Grounds raised**

Defendant raises three grounds for relief, but they are interrelated and therefore addressed together.  First, he asserts that his guilty plea was not voluntary, knowing, or intelligent due to his mental disability.  Doc. 93, p. 4.  He alleges multiple head injuries as a child, and that he was on Social Security Disability. *Id.*  He alleges that counsel told him if he entered the plea agreement he would be sentenced to 15 years, but by providing substantial assistance he would serve only three or four years.  *Id.* Defendant alleges he believed this, and that if he had comprehended he would serve 15 years, he would have insisted on going to trial.  *Id.*

In his second ground, Defendant asserts he was not competent to enter a plea, and as the court was aware of his disability (as it "commented on it during the plea proceeding,"), its failure to conduct a sua sponte competency proceeding before accepting the plea violated substantive and procedural due process. *Id.*, pp. 4-5.

Finally, Defendant asserts ineffective assistance of counsel for failing to have him evaluated to determine competency.  *Id.*, p. 5.  Defendant repeats his allegations that counsel advised of the 15 year sentence but told Defendant he would serve 3-4 years in exchange for providing substantial assistance, and if Defendant comprehended that he would actually serve 15 years, he would insisted on going to trial.  *Id.*, pp. 5-6.

**Procedural History**

Defendant and Samuel Alston entered their guilty pleas at the same proceeding, on October 2, 2008.  Doc. 96 (transcript).  Both swore to tell the truth.  *Id.*, p. 4. Defendant said he had graduated from high school.  *Id.*, pp. 4-5.  Asked by the court if he had ever been treated for mental or psychological problems, Defendant conferred with counsel, Clyde Taylor, and Taylor advised the court that Defendant was on social

security disability.  *Id.*, p. 6.  He said he had been treated by a mental health

professional before but could not remember, and did remember if a diagnosis was

made.  *Id.*, p. 6.  Taylor advised that Defendant had a closed-head injury at one time.

*Id.*  The court asked,

> Mr. Taylor, has Mr. Devane been able to consult with you and provide all
> of the information you need; is he able to understand your conversations
> and provide you all of the assistance that you would expect out of a
> defendant?

*Id.*, p. 6.  Taylor responded:

> Yes, sir, I have talked to my client and family, as well as the agents and
> the U.S. Attorney, and explained that it takes a little bit longer to go over
> things to make sure that Mr. Devane understands what's going on.  But on
> each question, after I reviewed it repeatedly with him, he's been able to
> respond other than a yes-or-no answer, to indicate to me that he
> understands what's going on.

*Id.*, p. 7.

The court asked Defendant directly about the injury, and Defendant said it

happened while he was in middle school, that he was choked by a hall monitor until he

passed out; Taylor clarified "[t]there was a question about oxygen."  *Id.*  Defendant said

he passed out and hit his head on the concrete, and was treated at the hospital.  *Id.*, p.

8.  Defendant said he was in eighth grade at the time, and he continued school and

graduated.  *Id.*

The court explained to both defendants the trial rights they were giving up by

pleading guilty, that there would not be a trial, and they would waive any defenses they

might have.  *Id.*, pp. 8-11.  The court talked to the defendants about the charges against

them and the facts in the case.  *Id.*, pp. 13-15.  Defendant said in his own words he was

getting powder cocaine from someone else and providing it to Alston, except the last time he had provided Alston with crack cocaine.  *Id.*, pp. 14-15.  Defendant did not recall the exact amount, but it was on the tape as the conversations were recorded.  *Id.*, p. 15. He said he agreed to sell crack and powder to Alston.  *Id.*  Taylor explained that based on the weights as found by law enforcement and set out in the statement of facts, the controlled sale included about six ounces of powder cocaine and three ounces of crack cocaine.  *Id.*, pp. 15-16.  Defendant interjected (through counsel) that the deal never went through because of the arrest, but agreed he had the cocaine, was planning to deliver it, and it involved about three ounces of crack.  *Id.*, p. 16.

Defendant identified his signature on the last page of the statement of facts, and Taylor said he had read it to him.  *Id.*, p. 17.  The court asked, "Mr. Devane, tell me – I mean, you [counsel] read it to him.  Do you have some difficulty reading and writing?" *Id.*  Taylor answered, "[n]o, sir.  We had just gotten it today in court; and, in order to get through everything, I went through it, and then asked him questions about each paragraph."  *Id.*  The court then asked Defendant directly, "Mr. Devane, Mr. Taylor went through every word of it with you?"; Defendant answered "[y]es, sir."  *Id.*

The court asked if there was anything in the statement of facts with which defendants did not agree, and Taylor went through each of the seven paragraphs.  *Id.*, p. 18 (*see also* doc. 96, statement of facts, comprised of a total of seven paragraphs). The court acknowledged what counsel said, and then asked Defendant, "except for the stuff about fleeing, is everything that this statement of facts says about you true?" Defendant answered "[y]es, sir."  *Id.*, pp. 18-19.

The court advised defendants about their maximum sentences and the sentencing procedure, and they said they understood.  *Id.*, pp. 20-21.  To avoid confusion, the court repeated the penalties, and told Defendant that on the drug charge he faced a minimum of 10 years and maximum of life, plus a minimum 5 year consecutive sentence on the firearm charge, and Defendant said he understood.  *Id.*, pp. 22-23.  Adding the minimum sentences (10 years and 5 years) Defendant would get at least 15 years in prison.  *Id.*, p. 23.  The court explained the only possible exception:

> If you cooperate with the government – that is, if you provide assistance in the investigation or prosecution of others – and if the government, the prosecutor, concludes that that assistance rises to the level of substantial assistance, the government can file a motion saying that you have provided substantial assistance in the investigation or prosecution of others; and, if the government files such a motion, that would allow me to impose a sentence below the minimum mandatory sentence.

*Id.*, pp. 23-24.  Defendant said he understood.  *Id.*, p. 24.

The court also advised that it was up to the prosecutor to decide if substantial assistance had been provided, and if it did not so decide, "*you will be stuck with that decision; there won't be anything you can do about it*," that the guilty plea could not be withdrawn no matter what sentence was imposed, but "will stand as established in this case for all time that you are, in fact, guilty," and Defendant said he understood.  *Id.*, pp. 24-25 (emphasis added).

As to the United States Sentencing Guidelines, the court advised that the lawyers, including the prosecutor, did not necessarily know what sentence would be called for under the guidelines.  *Id.*, pp. 26-27.  Defendant said he understood.  *Id.*, p. 27.

Defendant acknowledged his signature on the plea and cooperation agreement, said that Taylor had read it to him, and that he understood and agreed to every word in it. *Id.*, p. 28. He said he had no understanding or agreement with the Government that was not included in the agreement, he had not been threatened or pressured to enter a plea, and his lawyer had answered all his questions. *Id.*, p. 29. All the attorneys assured the court that as far as they were aware, the pleas (of both defendants) were freely and voluntarily entered with full knowledge of the consequences, and no agreements or understandings were made with the Government which were not set forth in the agreement. *Id.*, p. 30.

The plea agreement, which Defendant said he signed, understood, and agreed to every word, clearly stated that "regardless of cooperation, and at the sole discretion of the United States Attorney," it could be deemed that substantial assistance had not been provided. Doc. 52 (sealed), p. 4. It stated that if in the exercise of the Government's sole discretion it was determined that Defendant provided substantial assistance, and he had otherwise complied with all terms of the agreement, a substantial assistance motion would be filed. *Id.*, p. 5. It also provided that Defendant agreed that any prediction of his sentence "is not a guarantee or binding promise." *Id.*

Defendant pleaded guilty to conspiracy to distribute and possess with intent to distribute at least 50 grams of crack cocaine (ground one) and to possession of a firearm during and in relation to or furtherance of that offense (ground two), and said he was pleading guilty because he was, in fact, guilty. Doc. 96, p. 31. His plea was accepted, and the presentence process explained. *Id.*, pp. 32-33.

At sentencing, Defendant agreed that he read the presentence report (PSR) and addendum and had discussed it with his lawyer.  Doc. 97 (transcript of sentencing on December 11, 2008), pp. 2-3.  There were no objections which would affect calculation of the guidelines range in light of the statutory minimum mandatory sentences, but Taylor explained his objections.  *Id.*, pp. 3-5.  He also explained that Defendant had given a statement concerning Codefendant Ratliff, that Defendant was not used as a witness against Ratliff, but "continues to hold out a reasonable hope that at some point in time he may be able to provide additional information to the government that would be worthwhile," therefore counsel did not want to get into a "what he said/he said" argument about an obstruction increase that would not impact the sentence.  *Id.*, pp. 4-5.  Counsel for the Government explained what happened with Defendant and the Ratliff.  *Id.*, pp. 5-6.  The court said "[t]he only time it could [make any difference] would be if there was a Rule 35 motion."  *Id.*, p. 7.

Mr. Taylor noted that although Defendant "had a series of incidents in his life that have adversely impacted him," and he was on disability and had a medical problem which limited his ability to move his arm, his criminal history category was one.  *Id.*, pp. 8.  He noted the minimum mandatory, asked that the minimum be imposed, and asked "that the court consider placement in either, at least for initial evaluation, in a medical facility so that a thorough workup as to whether or not he would be able to function in a normal prison facility for people looking at a 15-year sentence, as it is an ongoing

concern to this lawyer as well as the family." *Id.*, pp. 8-9.[2] He said Defendant was interested in substance abuse and other self help programs. *Id.*, p. 9.

The prosecutor advised that Defendant made some unsuccessful efforts to cooperate the night he was arrested, and "went so far as to name an alleged source of supply outside of this county, but there was – I think there was a point where he also asked for a lawyer, and the cooperation didn't go any further." *Id.*, p. 10.  He said Defendant talked to them about Ratliff and his testimony as to Ratliff might have been helpful in some instances, but "[i]n other instances, it was baffling." *Id.*, pp. 10-11.  He explained how some of what Defendant said did not make sense, the case against Ratliff was strong and they did not need "needless complications," so the Government did not call Defendant as a witness. *Id.*, p. 11.

The court found the PSR accurate, and sentenced Defendant to the minimum total term of 15 years, followed by terms of supervised release. *Id.*, p. 13.  It would be recommended in the judgment, *inter alia*, that Defendant "be evaluated medically, neurologically and psychologically, within the Bureau of Prisons for any appropriate treatment and for an appropriate designation." *Id.*, p. 14.  Defendant was advised of his right to appeal, that he should talk to his lawyer about it, and that either counsel or the clerk could file a notice of appeal for him. *Id.*, pp. 15-16.

---

[2] Counsel said his understanding was that "if the court were to recommend a medical, a look-see, anyway, that, if he went to a medical facility and they cleared him, he would be transferred back to an appropriate Bureau of Prisons' facility," and whether he was sent to a medical unit or not, asked that Defendant be designated to an appropriate institution close to Tallahassee. *Id.*, p. 9.

The Government has filed the Bureau of Prisons Psychology Data System entry of notes taken at Defendant's intake screening at on January 30, 2009, upon receipt at FCI Jesup.[3]  Doc. 102 (sealed).  Defendant reported no treatment or mental health history, and his psychological stability for custody was judged to be favorable.  *Id.*  The psychologist noted that Defendant was cooperative, he was oriented in place, time, and situation, and his affect was appropriate.  *Id.*  He had experienced memory problems and headaches, but "denied experiencing significant mental health concerns or adjustment problems at this time."  *Id.*  No follow up was deemed necessary, and Defendant was cleared for placement in the general population.  *Id.*

Defendant filed his school records, and the affidavit of his sister explaining what Taylor told her and her mother, and that she, her mother, and Defendant all thought it was a "sure thing" that Defendant would serve only three to five years.  Doc. 107-1 (Exs. A and B to Defendant's reply).  She said Taylor continued sending letters after sentencing that a Rule 35 substantial assistance motion was in the process, but the letters are not provided.  In any event, counsel's continuing efforts post sentencing are irrelevant to Defendant's competency to enter a plea.

Forensic evaluations from November 2 to December 16, 2010, conducted for purposes of this § 2255 proceeding, resulted in a report dated January 3, 2011.  Doc. 116 (sealed).  Defendant was advised – and indicated he understood – that information from the evaluation was not confidential, and a written report would be provided to the

---

[3] The executed judgment (doc. 86) reflects Defendant's delivery to FCI Jesup on that date.

court.  *Id.*, p. 1 of the report.[4]  He was interviewed by a psychologist, observed by

correctional staff, and examined by medical personnel.  *Id.*  A list of tests administered

and other sources of information used in preparing the report is provided at page 2.

Defendant's sister Latoya Devane, Probation Officer Wilson (who prepared the PSR),

and attorneys Michael Simpson, Clyde Taylor, and Crystal Frusciante (§ 2255 counsel)

were interviewed.  *Id.*, pp. 1-2.

It was noted that Defendant experienced a significant head trauma at age 5 when

hit by a car and he reported lasting effects from the injury.  *Id.*, p. 3.  His head was

lodged under the car for several minutes, resulting in a coma and hospitalization for

many weeks.  *Id.*, p. 4.  His sister reported that he had to learn to walk again.  *Id.*  He

had cognitive difficulties afterwards and was classified as Educable Mentally

Handicapped (EMH).  *Id.*

At age 13 or 14 Defendant was hospitalized for another head injury; he lost

consciousness (from being placed in a choke hold) and his head hit the floor.  *Id.*  His

family prevailed in a law suit due to this injury.  *Id.*  Defendant also reported he had

been hit in the head with a baseball bat, but did not go to the hospital.  *Id.*  His sister

reported that in 2007 he was shot in the hand and leg outside their home, and she tried

to drive him to the hospital but her car hit a tree and he was taken by ambulance.  *Id.*

Defendant and his sister said he was hit in the back of the head by an arresting officer

(apparently as part of this same incident).  *Id.*  She said he showed her the injury and

---

[4] References are to the page of the report.  The pages assigned in ECF
(Electronic Case Filing) are one page off, due to the cover page.

his speech was slurred and his movements slow, but he did not recall the incident.  *Id.*, p. 5.  She said he had cognitive difficulties since early childhood because of the car accident, and his memory was limited so he had to be prompted to remember things. *Id.*  She said he could not talk for months after the childhood accident, and she and her mother had to work with him to improve his memory.  *Id.*

Defendant said he attended special education classes from an early age, and records showed he was classified as EMH since September 1994.  *Id.*, p. 3.  He received special services for the 2000-2001 school year due to behavioral issues, including disruptive and aggressive behavior resulting in danger to himself or others, frustration, lack of progress and limited ability to grasp the general curriculum.  *Id.* Records reflected teachers' comments, that he could read sentences but needed to improve comprehension, and that he complied with rules 70% of the time but could be verbally defiant and had a quick temper.  *Id.*  He graduated from high school with a "special diploma" in 2005.  *Id.*, pp. 3-4.

Defendant was given a routine physical examination which was normal, except his left hand had limited mobility, and he was admitted and discharged with no prescribed medication.  *Id.*, p. 6.  He was found by evaluators and staff to be cooperative, he complied with examination tasks and institutional rules, and  got along well with inmates and staff.  *Id.*  He maintained good personal hygiene, his motor functions, speech, attention and concentration seemed normal, and he was oriented as to time and place.  *Id.*  He lost track of complex questions and sentences, and his

memory "was sporadically accurate for recent events," but had trouble recalling older information.  *Id.*

In initial interviews and testing, and an early phone call (during an interview), appeared very confused and low functioning, and had little memory.  *Id.*  This was inconsistent, however, with his interactions with other inmates (observed by correctional officers), and with a number of telephone conversations which were monitored but were not made in the presence of the evaluator.  *Id.*, pp. 6-7.  His "ability to comprehend verbal communication, to process possible consequences, and to remember remote events appeared to function much better in the absence of the examiner."  *Id.*, p. 7. When confronted with this and possible sanctions if he were faking impairment, and informed that a finding of incompetency would require hospitalization and return to court when deemed confident, he left the session.  *Id.*  He returned an hour or so later and admitted to faking symptom earlier because other inmates told him to act impaired and not to trust prison staff.  *Id.*, pp. 7-8.  Defendant wanted another test to prove he was competent, and he showed no signs of impairment thereafter.  *Id.*, p. 8.

In later interviews he would have trouble repeating complex sentences in his own words, and would hesitate to ask questions so people would not think he was "dumb" or "stupid," but demonstrated comprehension when statements were broken into smaller segments and certain words were explained to him.  *Id.*

Defendant was diagnosed with "cognitive disorder not otherwise specified" based on history of head traumas, special education requirements through school, and "continued difficulties with memory and cognitive processing."  *Id.*, pp. 8-9.  His juvenile

adjudications for battery, and aggressive outbursts in school were not a sustained pattern or indicate a pervasive problem with behavior control. *Id.*, p. 9. "Thus, no diagnosis of conduct or personality disorder is given at this time." *Id.*

The evaluator was also asked for a retrospective competency evaluation, as to whether he would have understood the consequences of his plea and receiving a reduction for substantial assistance. *Id.* He was first given a competency test which was halted when the examiner explained to Defendant what could happen if he was faking impairment, but given a different competency test (at his request) the same day. *Id.*, pp. 9-10. It reflected knowledge of the roles of court personnel, courtroom procedure and decorum, and knowledge of his ability to assist counsel. *Id.*, p. 10. He was able to explain the charges against him although had difficulty with legal terminology. He described the offense behavior, referenced past encounters with the court system, the current proceedings and potential legal strategies, and therefore was deemed currently competent to stand trial or enter a plea. *Id.*

The evaluator reviewed the transcript of Defendant's sentencing hearing, and reports describing his behavior during the investigation and arrest. *Id.* The evaluator thought Defendant's conduct was similar to his current behavior, and that Defendant's answers at sentencing appeared sufficient for the judge to determine competency to enter a plea. *Id.*[5] Clyde Taylor was interviewed and later supplied a letter regarding Defendant's level of functioning and understanding. *Id.* Taylor reported that Defendant

---

[5] Though the reference is to the sentencing transcript, it is more likely the evaluator reviewed the transcript of both the plea and sentencing, or just the plea, as the determination related to competency at the time of the plea rather than sentencing.

needed extra time and explanation in order to understand his legal situation and possible alternatives, but he spent additional time to make sure Defendant understood, and had also discussed these things with the family who informed him of Defendant's head injuries.  *Id.*  Taylor would have referred Defendant for an evaluation if he thought it necessary, but did not believe his slower cognitive processing approached impairment affecting competency since Defendant seemed to understand and discuss alternatives with counsel.  *Id.*, pp. 10-11.  It was therefore determined that Defendant "appeared to have a factual and rational understanding of the nature and consequences of court proceedings, as well as the ability to assist and work with a defense attorney at the time he entered his guilty plea during the 2008 sentencing proceeding [sic, *see supra*, n. 5]."  *Id.*, p. 11.  Any potential additional head injury at the time of arrest or detention did not cause a deterioration of his abilities, and his "presentation and level of functioning appear to have been stable and consistent throughout his arrest, detention, incarceration, and the current period of evaluation."  *Id.*  It was therefore "opined that he is currently competent to stand trial, and to enter a plea," and "that at the time of sentencing, his level of understanding and ability to assist in his defense appeared to be similar to his current functioning, as there has been no evidence of deterioration or decline during the time periods in question."  *Id.*  He was considered likely to remain competent, and "[h]is prognosis is good at this time."  *Id.*

In argument after this evaluation was filed, the Government notes Defendant's admission to fabricating symptoms, and report that Defendant could comprehend statements when broken into smaller statements.  Doc. 119, p. 2.  In his post evaluation

argument, Defendant asserts that while one evaluator found him competent to proceed, he did not understand the nature and consequences of his plea, and "he and his family were assured by defense counsel and were under the impression that a substantial assistance motion was forthcoming."  Doc. 120.  He claims his "documented disability prevented him from understanding the nuances of a rule 35 motion to reduce a sentence."  *Id.*, p. 1.  While he may have understood he would be sentenced to 15 years "he never thought he would actually be required to serve more than three or four years."  *Id.*, p. 2.  No response or argument is made as to why the current evaluation should not be considered, or addressing in any way the fact that Defendant admitted that he was faking impairment during his evaluation.

**Legal Analysis**

The test for competency is whether Petitioner had "a rational as well as factual understanding of the proceedings against him," and a trial court violates *procedural* due process by failing to sua sponte conduct an inquiry when "the objective facts known to the trial court at the time create a bona fide doubt as to mental competency."  Wright v. Secretary for the Dept. of Corrections, 278 F.3d 1245, 1256 (11th Cir. 2002), *cert. denied*, 538 U.S. 906 (2003) (citations omitted).  A claim that Petitioner was actually incompetent at the time of his trial is a *substantive* due process claim which generally cannot be procedurally defaulted.  *Id.*, p. 1258-59 (citations omitted).  But there is no presumption of incompetency; it must be demonstrated by a preponderance of the evidence.  *Id.*, at 1259 (citations omitted).

> Only "[a] petitioner who presents clear and convincing evidence creating a
> real, substantial, and legitimate doubt as to his competence to stand trial

is entitled to a hearing on his substantive competency claim."  The point is that on this claim, "the standard of proof is high and the facts must positively, unequivocally, and clearly generate the legitimate doubt" about whether the petitioner was mentally competent when he was tried. "Not every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges."

Id., at 1259, quoting (with alterations and citations omitted), Medina v. Singletary, 59 F.3d 1095, 1106-07 (11th Cir. 1995).  Wright's chronic schizophrenia, the effects of which came and went, and findings of incompetency to stand trial at other times, did not meet this high standard of showing he was incompetent at the time of the trial at issue.

Id.

The best evidence of Wright's mental state at the time of trial is the evidence of his behavior around that time, especially the evidence of how he related to and communicated with others.  The unrebutted evidence at trial is that in the days and weeks leading up to the trial Wright behaved in a perfectly normal fashion, related well to others, and had no problem at all communicating with them.  There is no evidence that he behaved abnormally at trial, nor is there any evidence that he had any problem understanding the charges against him or communicating with his counsel.  This [substantive due process] claim fails on the merits.

Id.

Further, "[b]ecause legal competency is primarily a function of defendant's role in assisting counsel in conducting the defense, the defendant's attorney is in the best position to determine whether the defendant's competency is suspect."  Watts v. Singletary, 87 F.3d 1282, 1288 (11th Cir.1996), cert. denied, 520 U.S. 1267 (1997) (finding that counsel's failure to raise the issue of competency is evidence that competency was not in doubt).  Although Watts had slept through much of his trial because he smoked crack at night, the record was "devoid of substantial evidence that

[he] could not adequately understand the proceedings or assist counsel in his defense," and did "not unequivocally create a substantial doubt about his competency to stand trial."  87 F.3d at 1290.

    As set forth in detail above, counsel was aware and advised the court of Defendant's prior head injuries, and said it took longer to go over things but he did so repeatedly in a way indicating that Defendant understood what was going on. Defendant was able to tell the court about his offense in his own words.  When counsel answered for Defendant, the court asked Defendant directly whether counsel had gone over with him every word in the statement of facts.  He told the court Taylor read the plea and cooperation agreement to him and he understood every word of it.  He told the court he understood that the only exception to the minimum mandatory sentence was upon motion of the Government.  The court made it very clear that it was up to the prosecutor to decide whether to file such a motion, and either way Defendant would be stuck with his plea, establishing for all time that he was actually guilty.

    Defendant has not provided clear and convincing evidence which creates any substantial and legitimate doubt as to his competence to stand trial or enter a guilty plea.  He has demonstrated that he had some limitations, which were known and addressed by counsel and the court.  His solemn declarations to the court are presumed to be true.  There is no evidence to show he was then, or is now, unable to assist counsel or to understand charges, the legal process, or possible sentences.  He told the court, and signed a plea agreement, demonstrating an understanding that a substantial assistance motion was the only exception to the minimum mandatory, and

understood he was "stuck" with his plea whether or not the Government filed the motion.  He has not shown he was actually incompetent, or that his plea was unknowing due to incompetence and lack of understanding.

Since the record shows Defendant appeared to be competent, and in these proceedings he has not presented clear and convincing evidence raising a substantial or legitimate doubt as to his competency at the time of the plea, his other claims must fail.

> A defendant who was at the pertinent time competent to stand trial is not entitled to a new trial on the procedural ground that the trial judge in his initial trial failed to hold a competency hearing.  In a similar way, defense lawyers cannot have improperly prejudiced a defendant-depriving him of his constitutional right to counsel-by not asserting the need for (or appealing about) a competency hearing when the defendant was, in fact, competent for the pertinent period.

Moore v. Campbell,  344 F.3d 1313, 1324 (11th Cir.2003), *cert. denied*, 540 U.S. 1180 (2004) (citation omitted).

**Certificate of Appealability**

As amended effective December 1, 2009, § 2255 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. § 2255 11(b).

I find no substantial showing of the denial of a constitutional right.  § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483-84, 120 S.Ct. 1595, 1603-04, 146 L.Ed.2d 542

(2000) (explaining how to satisfy this showing) (citation omitted).  Therefore, I recommend that the court deny a certificate of appealability in its final order.

The second sentence of  new Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Any objections relevant to a certificate of appealability shall be made in a timely objection to the district judge.  Failure to present argument in objections may waive the argument that could have been presented.

Leave to appeal in forma pauperis should also be denied.  *See* Fed.R.App.P. 24(a)(3)(A) (before or after a notice of appeal is filed, the court may certify the appeal is not in good faith or the party is not otherwise entitled to appeal in forma pauperis).

**Conclusion**

It is therefore respectfully **RECOMMENDED** that Defendant Devane's § 2255 motion (doc. 93) be **DENIED WITH PREJUDICE**, and that a certificate of appealability be **DENIED** pursuant to § 2255 Rule 11(a).  It is further **RECOMMENDED** that the court **CERTIFY** that any appeal is not taken in good faith and leave to proceed in forma pauperis be **DENIED**.

**IN CHAMBERS** at Tallahassee, Florida, on April 18, 2012.


**S/    Charles A. Stampelos**
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**


**<u>NOTICE TO THE PARTIES</u>**

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**